U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2014 DEC 12  PM 1:59

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA    )
                            )
        v.                  )      Case No. 5:14-cr-28
                            )
TYSHAWN MACK                )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
(Doc. 47)

This matter came before the court on November 4, 2014 for an evidentiary hearing on Defendant Tyshawn Mack's motion to suppress evidence and statements (Doc. 47). Winooski Police Department Sergeant Michael Cram ("Sergeant Cram"), Vermont Drug Task Force ("VDTF") Detective Matthew Plunkett ("Detective Plunkett"), and Vermont State Police ("VSP") Trooper Angela Baker ("Trooper Baker") testified on behalf of the government.  During the hearing, the court admitted five videos, including two videos from Sergeant Cram's police cruiser's video recorder and three videos from an Axon camera on Sergeant Cram's chest.  The parties submitted their post-hearing briefing on November 14, 2014, at which point the court took the matter under advisement.

Defendant is charged in a Superseding Indictment with: Count One: conspiring to distribute heroin, a schedule I controlled substance, and cocaine base, a schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a), 841(b)(1)(C); Count Two: knowingly possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and Count Three: having previously been convicted of four felonies, knowingly possessing firearms, in violation of 18 U.S.C. § 922(g)(1).

Defendant seeks the suppression of all evidence obtained from his allegedly unlawful seizure during a motor vehicle stop that occurred on January 24, 2014 in Winooski, Vermont.  The government opposes the motion.

The government is represented by Assistant United States Attorney Nancy Creswell. Defendant is represented by Mark A. Kaplan, Esq.

## I.    Findings of Fact.

On January 24, 2014, Sergeant Cram was parked in a marked police cruiser at the corner of LaFountain Street and Leclair Street in Winooski, conducting surveillance of the residence of Deirdre Hey (a/k/a "Mama D"). Although he was not pursuing a specific investigation at the time, Sergeant Cram had previously responded to complaints at Mama D's apartment, which was located at 43 LaFountain Street. He credibly testified that, at the time, it was his understanding that Mama D was selling heroin and allowing people to sell heroin from her apartment. There was also a possibility that stolen property could be found there. Dylan Wright, Mama D's adult son, had recently told Sergeant Cram that if he ever saw a red truck at his mother's house he should pay attention to it because there would be a lot of drugs in it. Sergeant Cram was aware that Mama D and her son had a tumultuous relationship and he had previously received similar tips from Mr. Wright when he and his mother had a falling out. For that reason, Sergeant Cram took the tip "with a grain of salt."

On the same day as Sergeant Cram's surveillance of Mama D's residence, the VDTF and the VSP were preparing a search warrant application for a residence located at 42 Hickok Place in Burlington, Vermont. Scott Taylor and Kyle Tetreault had previously informed law enforcement that they were heroin users who were responsible for a series of burglaries in northern Vermont. Mr. Tetreault described 42 Hickok Place as a "drug hub" and both he and Mr. Taylor advised that they had purchased heroin there. They identified the residents of 42 Hickok Place by their street names "T" and "Sam" and described them as two African American males, one short and the other tall. Mr. Taylor advised that he had seen these individuals carrying pistols on their persons. Mr. Taylor and Mr. Tetreault further advised that on January 7, 2014, they committed a burglary in which they obtained firearms, including an AR-15 assault rifle, which they took to Mama D's apartment. They described Mama D as a drug dealer and drug addict with whom they traded firearms for heroin. They stated that, on January 7, 2014, they traded the AR-

2

15 assault rifle to "T" in exchange for a sleeve of heroin and that both "T" and "Sam" were at Mama D's apartment when the drugs-for-firearms transactions took place.

On January 24, 2014, from approximately 1:00 p.m. until 4:00 p.m., Detective Plunkett was parked in an unmarked car conducting surveillance of 42 Hickok Place so that, for officer safety purposes, law enforcement could ascertain the likely number of individuals at the residence if the search warrant application was granted. He credibly testified that there was "a lot of foot traffic" to and from the residence and that the visits were of short duration, which he found indicative of drug trafficking. At the time, Detective Plunkett did not know the full details of the investigation, but he was aware that two African-American males, one short and the other tall, were associated with 42 Hickok Place, that these individuals were suspected of receiving stolen property, that weapons were involved, and that the males could be going to a secondary location.

At approximately 4:00 p.m., Detective Plunkett's supervisor, Sergeant Theresa Randall, relieved him so that he could warm up because temperatures were growing increasingly frigid. Detective Plunkett drove around the corner and sat in his car with the engine running. Sergeant Randall observed a tall African-American male leave 42 Hickok Place, followed shortly thereafter by a white male and a short African-American male wearing a red hat. The short African-American male wearing the red hat used a key to lock the door to the residence as he left. Sergeant Randall relayed this information to Detective Plunkett and told him to watch for these individuals. As the two males turned the corner and walked down Greene Street, Detective Plunkett observed the white male get into the driver's seat and the African-American male with the red hat get into the front passenger seat of a red Ford pick-up truck with Vermont license plate number 203A503. Detective Plunkett followed the red truck west on Pearl Street and south on South Winooski Avenue and into a Rite-Aid parking lot. In the Rite-Aid parking lot, a tall African-American male, who Detective Plunkett suspected was also associated with 42 Hickok Place, approached the passenger side of the red truck and spoke with its occupants.

3

The red truck then left Rite-Aid, traveled south on South Winooski Avenue, and turned east onto Main Street in Burlington. On Main Street, Detective Plunkett was able to pull up next to the red truck and view its occupants. Detective Plunkett continued to follow the red truck until it parked in a parking lot shared by a Motel 6 and a McDonald's. Detective Plunkett could not see whether the occupants of the red truck entered either establishment. Because he had been following the red truck for some distance and was concerned he might alert the occupants to the fact that they were being followed, Detective Plunkett arranged to have VDTF Detective Matthew Daley follow the red truck as it drove south on Main Street in Winooski and then turned onto LaFountain Street, near the apartment of Mama D. Detective Plunkett stayed in the area to support Detective Daley. Both detectives briefly lost sight of the red truck.

Shortly after 5:00 p.m., Sergeant Cram saw the red truck approaching his location. He had seen the red truck on a previous occasion parked near Mama D's apartment and recognized the license plate number. He decided to follow the red truck with the intention of stopping the vehicle if he witnessed a motor vehicle violation that would justify a traffic stop.

As Sergeant Cram followed the red truck, he saw it stop for four to five seconds in its lane of travel on Leclair Street, which he considered a violation of 23 V.S.A. § 1101(a).[1] Thereafter, the red truck resumed its travel until it approached a stop sign on the partially snow covered road.[2] The red truck appeared to slow to a stop, but the cruiser

---

[1] 23 V.S.A. § 1101(a) provides:

> No person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway or within that portion of a highway right of way which the traffic committee finds to be a dangerous location on the basis of an engineering and traffic investigation and designates as a no-parking zone by suitable signs at each end, and by such additional signs as the committee may determine.

[2] The cruiser video commences as the red truck approaches the stop sign. Where the video conflicts with the officers' testimony at the court's evidentiary hearing, the court has relied on the video. *See Scott v. Harris*, 550 U.S. 372, 379 (2007) (ruling that the court may rely on an unaltered video recording when it conflicts with witness testimony).

video reveals that the truck's rear wheels never stopped rotating.  Sergeant Cram considered this a violation of 23 V.S.A. § 1048(b).[3]  In front of the stop sign was a white line indicating where traffic must stop before entering the intersection.  The point at which the red truck slowed down as if to stop was beyond the white line.  Sergeant Cram deemed this a further violation of 23 V.S.A. § 1048(b).[4]  At approximately 5:22 p.m., Sergeant Cram turned on his cruiser lights and effected a traffic stop based on the motor vehicle violations he had witnessed.[5]

Sergeant Cram approached the driver's side of the red truck and asked for the driver's license and registration.  Evan Blum, the operator of the truck, provided both. Sergeant Cram then asked the passenger, who he described as an African-American male wearing a red hat, for identification.  The male, who was later identified as Defendant, responded that he did not have identification and that his name was Samual J. Young, his date of birth was February 25, 1975, and he lived at 42 Main Street in Boston.  Sergeant Cram returned to his cruiser and requested that dispatch check Mr. Blum's license and registration.  Sergeant Cram also asked dispatch to check the information provided by Defendant.

Detective Plunkett saw the red truck at the traffic stop and relayed this information to his commander.  At approximately 5:26 p.m., dispatch asked Sergeant Cram to call Detective Plunkett because the VDTF had been watching the red truck.  Sergeant Cram called Detective Plunkett and discovered that he was in the area.  Detective Plunkett advised that he had been following the red truck for approximately forty minutes and Sergeant Cram confirmed that he, too, had been watching it.  Sergeant Cram told Detective Plunkett that he was going to release the truck and its occupants and that they

---

[3] "[E]very driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop[.]" 23 V.S.A. § 1048(b).

[4] "[E]very driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line[.]"  23 V.S.A. § 1048(b).

[5] Sergeant Cram did not issue any tickets or warnings for the motor vehicle violations.

had just given him "some bullsh*t story that they were headed to LaFountain Street but forgot their Chicken McNuggets and were headed back to McDonald's." Detective Plunkett confirmed that the males had indeed just visited McDonald's. After consulting with his commander and receiving a directive to detain the red truck, at approximately 5:29 p.m., Detective Plunkett told Sergeant Cram to "hold onto that car, don't let it go." In a series of phone calls, Detective Plunkett explained that VDTF had been conducting surveillance at the residence of the red truck's occupants, that "we don't have anything to arrest these guys on," but noted that the red truck was related to a search warrant that was in the process of being executed in Burlington. Detective Plunkett advised that they were sending other officers to the scene of the traffic stop, including a VSP Trooper. Sergeant Cram responded that he would detain the red truck's occupants and made a joke about how he typically works slowly. He credibly testified that he decided to detain the red truck and its occupants after the completion of the motor vehicle stop because he believed he had a good faith basis to rely on Detective Plunkett's request.

Sergeant Cram returned to the red truck and approached the passenger's side. He told Defendant that there was nothing in the system regarding him, and verified with Defendant the spelling of his first name ("Samual" versus "Samuel"). Sergeant Cram then returned to his cruiser.

Thereafter, dispatch confirmed that Mr. Blum's license was valid. Sergeant Cram asked dispatch to check him for conditions of release. He again attempted to verify the identity of Defendant. Dispatch confirmed it could not find a match for either spelling of the first and last name with the date of birth provided. At approximately 5:38 p.m., Sergeant Cram stated: "I'm sure it is a false name." Because the license plate number for the red truck had been miscommunicated, Sergeant Cram was still waiting for confirmation that the truck's registration was valid.

At approximately 5:40 p.m., VSP Trooper Jacob Metayer arrived on the scene to support the investigation and Sergeant Cram summarized the situation for him. He told Trooper Metayer that he had been watching a house down the street and had received some information on the vehicle two days ago. Sergeant Cram said he would "jack them

6

up," which meant he would hold up the vehicle's occupants.  Trooper Metayer responded that Sergeant Cram knew more about the investigation than he did.  Trooper Metayer briefly approached the red truck and spoke to its occupants but did not interact with them further.  The contents of his conversation with the red truck's occupants was not presented as evidence.

At approximately 5:43 p.m., Sergeant Cram asked dispatch to send a canine unit. Sergeant Cram was not sure at that point if a canine unit would be necessary, but he had suspicions of drug involvement and because the Winooski Police Department did not have a canine unit, he knew he would need to request one from another law enforcement agency.  At approximately 5:49 p.m., dispatch advised that the neighboring jurisdictions of Burlington, Colchester, and Milton did not have an available canine unit.

At approximately 5:58 p.m., Sergeant Cram returned to speak with the occupants of the red truck.  He told them that another police officer was coming to speak with them and advised: "you're detained until then."  According to Sergeant Cram, at this point, neither Defendant nor Mr. Blum was free to leave.  While he stood next to the red truck, Sergeant Cram engaged in casual conversation with the two men which was light-hearted at times, but which nonetheless included several questions.  Sergeant Cram told Defendant that he could not find him in the system and again asked whether Defendant possessed any identification.  Defendant advised that he did not and was staying with his girlfriend Diane Winchester.  Defendant also mentioned that he was going to a sports event for which he had tickets.  Sergeant Cram asked if there were any guns in the truck and was told that there were not.  He asked Defendant if he had ever been arrested and Defendant responded in the negative.  Sergeant Cram asked about Defendant's address and whether it was in a specific town in Massachusetts to which Defendant responded that he had just moved and reiterated that his address was 42 Main Street in Boston.  In the course of the conversation, Mr. Blum advised that he was going to see Katie and appeared to describe her residence as the same as Mama D's.

During this encounter, Sergeant Cram observed that Defendant was "very exaggerated" in his hand motions and in his speech and "he could not sit still."  He

7

further noted that Defendant was wearing a New York Giants hat and yet claimed to be living in Boston. During the conversation, Evan Blum avoided eye contact, looked down, and deferred to Defendant to respond to most of Sergeant Cram's questions. Sergeant Cram credibly testified that it appeared that Mr. Blum was trying to ignore what was happening.

At approximately 6:03 p.m., Trooper Angela Baker arrived at the scene of the traffic stop. Trooper Baker approached and stood at the driver's side door of the red truck and another officer stood at the passenger's side door of the red truck, effectively blocking any exit. An agent from the Bureau of Alcohol, Tobacco and Firearms arrived, and parked his vehicle "nose to nose" in front of the red truck. A law enforcement vehicle was also parked behind the red truck. As she spoke to truck's occupants, Trooper Baker shined a flashlight into their faces. When Mr. Blum asked to roll up the truck's windows because of the cold, she told him he could not do so. Trooper Baker credibly testified that when she spoke to the red truck's occupants, they were not free to leave.

Although Trooper Baker lacked a full understanding of the events preceding the traffic stop, as the affiant for the search warrant application for 42 Hickok Place, she was aware of the connection between 42 Hickok Place and 43 LaFountain Street and understood those residences were locations of suspected trafficking in heroin, firearms, and stolen property. The red truck was not involved in her investigation and she did not know the identity of its occupants or their relationship to any alleged criminal activity, however, she was aware of the red truck's path of travel, law enforcement's surveillance of the vehicle, and that its occupants included a "white male and an African-American male" who left 42 Hickok Place with the African-American male locking the door as he left.

Trooper Baker informed Mr. Blum and Defendant that she knew where they were coming from and where they were headed and that the stop was not a random stop. She asked them if they had anything on their persons and told them that 42 Hickok Place was surrounded by police officers and a tactical team, that their vehicle left 42 Hickok Place for 43 LaFountain Street, which was the other location police were surveilling, and that it

8

was up to the males to tell her what was going on. She asked the males who Mama D was. Trooper Baker advised that they were waiting for a drug dog and that the males should tell the truth in response to her questions. When Mr. Blum told her that they were headed to LaFountain Street to see Katie, Trooper Baker asked what drugs Katie used and expressed her belief that Katie was a drug addict. Trooper Baker's tone of voice was accusatory, but she asked relatively few questions and received noncommittal answers. Defendant advised her that he was "just trying to get laid" and he generally denied knowledge of the matters to which she referred.

Trooper Baker credibly testified that Mr. Blum appeared "very strung out" and uncomfortable. She suspected that he was an opiate user. In contrast, Defendant was "almost the opposite" and was very engaged and talkative, "moving all over the place," to the point that she found his behavior "over the top."

The officers decided to separate Mr. Blum and Defendant. Defendant remained in the red truck while Mr. Blum exited the red truck and waited in a law enforcement officer's vehicle. At approximately 6:44 p.m., Corporal Michelle LeBlanc arrived with "Casko," a certified drug detection canine. Consistent with her standard procedure, Corporal LeBlanc led Casko twice around the red truck. On the second trip around the vehicle, Casko alerted near the truck's passenger door. Defendant asked questions about the drug dog and appeared anxious about its presence. Trooper Baker credibly testified that Defendant appeared relieved when he commented that the drug dog did not alert on the vehicle. Corporal LeBlanc corrected him and told him that the drug dog had alerted. In response, Defendant slumped in his seat and then began to move inside the cab of the truck despite the officers' commands that Defendant remain in his seat. The engine of the red truck was running because of the extreme cold. Defendant moved from the passenger seat to the driver's seat of the red truck. In response, Sergeant Cram grabbed Defendant's shirt, drew his firearm, pointed it at Defendant's chest, and told him to stop moving. At approximately 6:59 p.m., despite Sergeant Cram's commands, Defendant began driving the red truck away from the scene, briefly dragging Sergeant Cram with him.

9

Thereafter, Sergeant Cram and the other officers entered their own vehicles and pursued the red truck through downtown Winooski at speeds of approximately eighty miles per hour. The red truck eventually crashed into a parked car and a stopped car. Defendant exited the truck and fled on foot. Sergeant Cram and Trooper Metayer followed him and Sergeant Cram ultimately stopped Defendant by deploying his Taser and then placing Defendant into handcuffs. A search of Defendant revealed U.S. currency and marijuana. The officers took Defendant back to the VSP barracks in Williston, fingerprinted him, and used a computer database to identify him as Tyshawn Mack of Brooklyn, New York. Once identified, the officers learned Defendant was subject to a warrant in New York and had previous felony convictions for robbery and drug offenses.

Law enforcement towed the red truck to the VSP barracks and applied for a warrant to search it. After the search warrant application was granted, the police searched the red truck and seized loaded firearms, narcotics, and cell phones from it.

## II. Conclusions of Law and Analysis.

In seeking suppression of the evidence against him, Defendant challenges the validity of the initial traffic stop, whether the officers had reasonable suspicion to detain him after the purpose of the traffic stop was completed, whether the stop was reasonable in scope and duration, and whether any alleged illegality tainted the subsequent warrant application to search the red truck. The government argues that suppression is not warranted because Sergeant Cram properly stopped the red truck for motor vehicle violations, the officers had a reasonable suspicion of drug activity to justify detaining and questioning Defendant further, the stop was reasonable in scope and duration, and the officers' conduct during the stop did not taint their subsequent search warrant application.

### A. Whether Defendant Has Standing to Challenge the Legality of the Traffic Stop.

The government argues Defendant lacks standing to challenge the legality of the traffic stop of the red truck. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by

10

means of physical force or show of authority, terminates or restrains his freedom of movement, *through means intentionally applied*." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted). "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Id.* at 255 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "[A] passenger is seized as well and so may challenge the constitutionality of the stop." *Id.* at 251; *see also United States v. Chin*, 2013 WL 5406239, at *5 (D. Vt. Sept. 26, 2013) ("[A] passenger has standing to challenge the constitutionality of a stop of the vehicle in which he or she is traveling."). Defendant may therefore challenge the legality of the traffic stop of the red truck. *See Brendlin*, 551 U.S. at 252.

**B.    Whether Sergeant Cram Had A Reasonable Suspicion to Stop the Red Truck.**

"[T]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012) (internal quotation marks omitted). "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

"Because a *Terry* stop impinges to a lesser extent on Fourth Amendment concerns than does an arrest or search, the stricter standard of probable cause does not apply." *United States v. Bayless*, 201 F.3d 116, 132 (2d Cir. 2000) (citation omitted). Accordingly, although "an officer's reliance on a mere 'hunch' is insufficient to justify a stop,' the requisite likelihood of criminal activity "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quoting *Terry*, 292 U.S. at 27).

In determining whether a reasonable suspicion exists, the court's inquiry is an objective one and "the subjective intentions or motives of the officer making the stop are irrelevant." *Bayless*, 201 F.3d at 133.  The court "must consider the totality of the circumstances surrounding the stop," and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* (internal quotation marks omitted).

Here, Sergeant Cram observed at least two motor vehicle violations[6] which rendered it objectively reasonable for him to stop the red truck for those violations, even if he was following the red truck in the hope of gleaning information regarding its involvement in drug activity at Mama D's apartment. *See Bayless*, 201 F.3d at 133 (2d Cir. 2000); *see also United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1999) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." ).  Defendant's motion to suppress on the basis of an unlawful traffic stop is therefore DENIED.

### C.   Whether the Officers Had A Reasonable Suspicion to Prolong the Traffic Stop.

Defendant contends that even if the initial stop was lawful, the officers unreasonably prolonged the stop such that it was unreasonable in scope and duration in

---

[6] The court found credible Sergeant Cram's testimony that the red truck stopped in its lane of travel, albeit briefly.  The video recording further reveals that the red truck failed to come to a complete stop at the designated white line in front of a stop sign and that although it appeared to pause, its tires continued to rotate as it preceded into the intersection with Bellevue Avenue.  The Vermont Supreme Court has held an "officer's stop of defendant was valid if he had a reasonable suspicion that defendant had violated 23 V.S.A. § 1048(b) (driver approaching stop sign shall stop)." *State v. Flynn*, 674 A.2d 792, 793 (Vt. 1996).  Although the Vermont Supreme Court has not squarely addressed the proper interpretation of 23 V.S.A. § 1048(b), courts interpreting similar laws in other jurisdictions have concluded that a vehicle must come to a complete stop before the designated marked stop line. *See, e.g., State v. Daniels*, 39 Fla. L. Weekly D1014, 2014 WL 1976269, at *2 (Fla. Dist. Ct. App. May 16, 2014) (collecting cases and noting that "[a] stop line protects other motorists and pedestrians only if a vehicle stops when its front bumper reaches that line."); *People v. Wood*, 883 N.E.2d 620, 624 (Ill. App. Ct. 2008) ("conclud[ing] that the General Assembly did not contemplate that stopping astride a clearly marked stop line would constitute compliance[.]").

violation of the Fourth Amendment. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Officers may continue an investigation when they "detect[] an independent basis for continuing to detain the [vehicle] and its occupants." *See United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006).

In this case, Sergeant Cram did not unreasonably prolong the traffic stop when he asked Mr. Blum for his license and registration, asked Mr. Blum and Defendant about the truck's path of travel, and asked Defendant for identification. These inquiries were either directly related to the traffic stop or were brief roadside questioning that courts have found permissible provided responses are not compelled. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required.") (internal citations omitted); *United States v. Long*, 320 F.3d 795, 799 (8th Cir. 2003) (ruling that "[a]n officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip.").

In response to Sergeant Cram's questioning, Defendant provided a false name and presumably false information regarding his place of residence.[7] Even if the initial traffic stop was unlawful, this evidence of a new crime authorized Sergeant Cram to detain

---

[7] "A person who knowingly gives false information to any law enforcement officer with purpose to implicate another or to deflect an investigation from the person or another person shall be imprisoned for not more than one year or fined not more than $1,000.00, or both." 13 V.S.A. § 1754(a).

Defendant for further investigation. *United States v. Remington*, 208 F.2d 567, 570 (2d Cir. 1953) (Recognizing that it would be "an unwarranted extension of [the fruit of the poisonous tree] doctrine to apply it . . . to a new wrong committed by the defendant."); *see also United States v. Awadallah*, 349 F.3d 42, 81 n.8 (2d Cir. 2003) (Straub, J., concurring) ("Other circuits have likewise held that the fruit of the poisonous tree doctrine does not apply to new crimes committed by an individual who has been unlawfully detained.") (collecting cases). Correspondingly, "if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." *United States v. Bailey*, 691 F.2d 1009, 1016-17 (11th Cir. 1982); *see also United States v. Williams*, 2014 WL 412526, at *8 (D. Vt. Feb. 3, 2014) (noting police officers may arrest a defendant for the crime of false information to a police officer where defendant provides the information during an unlawful stop). Because the inquiry is an objective one, Sergeant Cram's initial decision to release the occupants of the red truck notwithstanding evidence of a new crime is not dispositive.

Thereafter, Sergeant Cram detained Defendant at Detective Plunkett's request. When he did so, Sergeant Cram was aware of some facts which supported a conclusion that the red truck was connected to drug activity at Mama D's apartment. In addition to the tip from Dylan Wright that the red truck was likely to contain a large quantity of drugs, Sergeant Cram had previously seen the red truck parked near Mama D's which he understood was a location from which heroin sales were conducted and where stolen property might be found. He was aware that the red truck's occupants planned to travel to Mama D's apartment to see a female who lived there. He suspected Defendant had given him a false name and false address and he believed the conduct of both Mr. Blum and Defendant evidenced an atypical reaction to a mere traffic stop. The court need not determine whether this information was sufficient to constitute a reasonable suspicion of criminal activity because Sergeant Cram was permitted to rely on the collective knowledge doctrine in carrying out Detective Plunkett's request.

> Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific

14

> information to form the basis for probable cause or reasonable suspicion
> but sufficient information to justify the arrest or search was known by other
> law enforcement officials initiating or involved with the investigation.

*United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). The doctrine exists because, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (internal quotation marks omitted).

"[A]pplication of the imputed knowledge doctrine requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified." *Colon*, 250 F.3d at 136. An officer may rely on the request of another officer to stop a suspect, even if the stopping officer has not been told all of the information about the suspect known by the requesting officer. *See United States v. Hensley*, 469 U.S. 221, 232 (1985) (concluding that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification[.]"). However, "some amount of communication between officers is necessary in order for a second officer's reliance on the first officer's knowledge to be reasonable." *Wong v. Yoo*, 649 F. Supp. 2d 34, 60 n.11 (E.D.N.Y. 2009) (citing *Loria v. Gorman*, 306 F.3d 1271, 1292 (2d Cir. 2002)).

In the instant case, VDTF officers involved in the detention of Defendant knew that he had just traveled from 42 Hickok Place to LaFountain Street in the red truck, and that he had locked the front door to 42 Hickok Place upon leaving. Surveillance of 42 Hickok Place on the day of the motor vehicle stop revealed foot traffic to that residence indicative of illegal drug activity. *See United States v. Feliz*, 657 F. Supp. 2d 364, 373 (E.D.N.Y. 2009) (stating the collective knowledge doctrine allowed an inference that individuals were associated with drug trafficking based on GPS surveillance that placed the defendant's vehicle near a shipping port where members of a drug organization had

previously picked up drugs). VDTF and VSP were preparing a search warrant application for 42 Hickok Place based upon recent information that the residence was used as a place where illegal drugs could be purchased and stolen property traded. This information included Mr. Tetreault's and Mr. Taylor's statements that they had recently traded an AR-15 assault rifle from a burglary they committed for a sleeve of heroin obtained from a resident of 42 Hickok Place. The firearm-for-drugs transaction took place at Mama D's apartment located at 43 LaFountain Street. Mr. Tetreault and Mr. Taylor described Mama D as a drug dealer and drug addict with whom they had previously traded firearms for heroin. They described the residents of 42 Hickok Place as two African-American males whom they knew by their street names "T" and "Sam," one of whom was tall and the other short. Sergeant Cram had advised dispatch that the passenger was an African-American male who stated his first name was Samual.

Through a series of communications between Sergeant Cram and his dispatch and Detective Plunkett and members of the VTDF and VSP, collectively, law enforcement possessed ample facts to establish a reasonable, articulable suspicion that Defendant may be "Sam" who resided at 42 Hickok Place and that he may be involved in the trafficking of drugs, firearms, and stolen property. *See United States v. Nafzger*, 974 F.2d 906, 916 (7th Cir. 1992) (finding the collective knowledge doctrine gave reasonable suspicion where an investigating officer knew that a stolen vehicle had been seen on the defendant's property). *See United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010) (holding that the collective knowledge doctrine established probable cause to arrest where an informant engaged in a controlled buy with a defendant). Sergeant Cram therefore did not violate the Fourth Amendment when he detained the red truck's occupants at Detective Plunkett's request. Defendant's motion to suppress based upon an illegal detention is therefore DENIED.

**D.      Whether the Officers Unreasonably Prolonged the Stop As They Waited for a Canine Unit to Arrive.**

Having found the initial stop and detention of Defendant constitutional, the court must evaluate whether the officers unreasonably prolonged the stop while they awaited the arrival of a canine unit.

> [A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.  A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

*Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (internal citation omitted).

Defendant was detained for approximately eighty-two minutes from the time of the initial traffic stop until the arrival of the canine unit.  During some of that time period, Sergeant Cram was awaiting information regarding whether Mr. Blum had conditions of release, whether the truck's registration was valid, and whether Defendant had provided him with a false name.  The time spent on those activities was reasonably related to the traffic stop.  *See United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (finding a detention was reasonable when "[t]he majority of the nearly forty-five minute encounter was spent completing the traffic stop[.]").

After the initial traffic stop was completed, Defendant was detained for approximately one additional hour to await the arrival of the drug detection canine unit. During this time period, law enforcement had a reasonable, articulable suspicion that Defendant was involved in trafficking drugs, firearms, and stolen property and Trooper Baker was questioning both him and Mr. Blum regarding that involvement.  Accordingly, the additional time was directly related to an ongoing investigation that was supported by a reasonable suspicion that criminal activity was afoot.  As a result, this is not a case in which a traffic stop is unreasonably prolonged so that a drug detection canine can arrive in hopes of establishing either a reasonable suspicion or probable cause.

Sergeant Cram called for a canine unit as soon as he suspected drug involvement because he knew the canine unit would need to be provided by a different agency.  *See*

17

*United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (noting an officer calling for a canine unit within twelve minutes of arriving on the scene contributed to a showing that the officer acted diligently). At approximately 5:49 p.m., dispatch indicated that the neighboring jurisdictions of Burlington, Colchester, and Milton did not have an available canine unit. *See United States v. McBride*, 676 F.3d 385, 395 (4th Cir. 2012) (determining a fifty-five minute detention, while the officers waited for a canine unit, "was reasonable given the officers' diligence in pursuing their investigation.").

VSP Trooper LeBlanc and Casko arrived at approximately 6:44 p.m. and Casko alerted on the red truck a few minutes later. Courts have concluded that detentions in excess of an hour are reasonable provided the officers acted diligently as they did here. *See, e.g.*, *United States v. Maltais*, 403 F.3d 550, 557-58 (8th Cir. 2005) (upholding a detention of nearly three hours where the defendants were stopped in a remote location, the officers had trouble finding an available canine unit, and the officers responded diligently); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (finding an eighty minute wait for a canine unit after the officer had already conducted a basic investigation in a traffic stop was reasonable).

Because law enforcement acted diligently in obtaining a canine unit once there was a reasonable suspicion that the red truck's occupants may be involved in drug activity, Defendant's motion to suppress on the grounds that the traffic stop was unreasonable in scope and duration is DENIED.

### E.     When Defendant was in Custody for the Purposes of *Miranda*.

Defendant seeks to suppress all statements that he made during the traffic stop, arguing that he was in custody when Sergeant Cram and Detective Plunkett decided to detain the red truck, or, alternatively, once Trooper Metayer arrived. The government concedes "[o]nce the State Police arrived and based upon its investigation, probable cause arose and [Defendant] was in custody." (Doc. 70 at 11.) The government represents that it will not use Defendant's statements in its case-in-chief after Defendant

18

was in custody.[8]  It is undisputed that Defendant did not receive *Miranda* warnings and thus the only question is when law enforcement's questioning of Defendant became custodial.

Defendant was not in custody at the time of the initial traffic stop because "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 430, 440 (1984) (italics supplied).  In such circumstances, "one expects the detention to be brief and the questioning to be circumscribed and related to the driver's identification, authorization to drive, and conduct on the roadway" and thus there is little "fear [of] the coercion present in stationhouse interrogations that prompted *Miranda*[.]"  *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).  However, depending on the officers' conduct, "[t]he initial stop and investigative detention [may] evolve[] into a situation indistinguishable from an arrest."  *Gilles v. Repicky*, 511 F.3d 239, 246 (2d Cir. 2007).

"[C]ustody remains the touchstone for application of [*Miranda's*] warning requirement."  *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004).

> The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody.  The ultimate inquiry for determining *Miranda* custody, however, is that articulated by the Supreme Court in *California v. Beheler*: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Id.* at 670 (internal quotation marks omitted).  To determine whether an individual is in custody, "courts . . . examine all of the circumstances surrounding the interrogation," *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2402 (2011) (internal quotation marks omitted),  including:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons

---

[8] However, if Defendant testifies, "the government may introduce un-*Mirandized* statements to impeach the defendant's testimony" "because a defendant must testify truthfully or suffer the consequences."  *United States v. Siddiqui*, 699 F.3d 690, 706 (2d Cir. 2012) (internal quotation marks and citations omitted).

were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion . . . . The circumstances also include . . . the nature of the questions asked.

*FNU LNU*, 653 F.3d at 153.

It is undisputed that Defendant was not free to leave when Sergeant Cram advised the truck's occupants were detained until the arrival of another officer who wanted to talk to them. However, as Sergeant Cram briefly stood outside the red truck and engaged its occupants in conversation, there were little, if any, of the hallmarks of a formal arrest. Sergeant Cram was not blocking the red truck's exit, he did not issue any orders to the occupants other than to advise them that they were being detained at another officer's request, he did not restrain their freedom of movement in the truck in any respect, and although he asked questions, he did so in a conversational and light-handed manner, interspersing those questions in a discussion of sports teams and the occupants' plans for the evening. *See United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (in addition to law enforcement conveying to a defendant that he or she is not free to leave, "a custodial setting is one providing 'inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak.'") (citation omitted). Sergeant Cram's tone of voice was not accusatory and he did not confront the occupants with the evidence against them. *See United States v. Guarno*, 819 F.2d 28, 32 (2d Cir. 1987) (noting the "manner of approach or . . . tone or extent of [the officers'] questioning" factored into the analysis of whether a suspect was in custody); *see also United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (finding an interview "conducted in an open, friendly tone" was not a custodial interrogation).

In addition, Sergeant Cram did not use force, display force, or threaten to use force and he did not advise Defendant he was under arrest or would be arrested. Although Defendant was not free to leave, his brief detention remained the type of roadside detention deemed non-custodial in *Berkemer v. McCarty*. *See Berkemer*, 468 U.S. at 440 (holding that "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*").

The government has conceded that Defendant was in custody when Trooper Metayer arrived notwithstanding the scant evidence to support this conclusion. Trooper Metayer played only a limited role in the stop and acknowledged he had limited knowledge regarding the investigation. He briefly approached the red truck and spoke to its occupants, however, there is no evidence regarding the contents of that exchange. There is also no evidence that he displayed a weapon, threatened Defendant with arrest, or confronted Defendant with the evidence against him. Thereafter, Trooper Metayer returned to his own vehicle to await arrival of additional law enforcement officers. Nothing about Trooper Metayer's presence at the scene rendered the traffic stop custodial. *See United States v. Campbell*, 741 F.3d 251, 267 (1st Cir. 2013) (finding defendants were not in custody when they were questioned by multiple law enforcement agents).

When Trooper Baker arrived at the traffic stop at approximately 6:03 p.m., the nature and circumstances of the stop changed markedly. Trooper Baker acknowledged that Defendant was not free to leave at that time and, in fact, the red truck's exit was blocked by law enforcement vehicles. Trooper Baker stood in front of the driver's door while another officer stood at the passenger door, blocking the occupants' exit. As Trooper Baker shined a flashlight into the occupants' faces while questioning them, the men were effectively surrounded by law enforcement officers, many of whom were presumably armed. *See Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir. 1996) (holding an interrogation was custodial where police officers "surrounded [a suspect's] car, blocked the driveway from his car to the street, and escorted him inside" to ask questions); *United States v. Scharf*, 608 F.2d 323, 325 (9th Cir. 1978) (holding an interrogation was custodial where a defendant "was surrounded by the officers.").

Trooper Baker's tone was accusatory as she confronted Defendant with the evidence against him and told him that law enforcement believed he lived in a residence currently surrounded by police who were executing a search warrant there. She made it clear to Defendant and Mr. Blum that the red truck had been under surveillance for some time and that they knew where it had been and where it was going. She further advised

21

that the traffic stop was not random but was a deliberate effort to ascertain whether Defendant and Mr. Blum were involved in illegal activity. *See United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993) (finding that where "the nature of the police/citizen encounter progresses beyond a short investigatory stop, a custodial environment is more likely" and "[w]here police are in full control of the questioning environment, custody is more easily found.").

Trooper Baker limited the occupants' freedom of movement by telling Mr. Blum he could not roll up the truck's windows, by separating the men, and by directing Defendant to stop moving around in his seat. *See Cruz v. Miller*, 255 F.3d 77, 85-86 (2d Cir. 2001) (noting "some of the circumstances admittedly point toward custody" including that the police officers "ordered the suspect not to move and to put his hands up"); *United States v. Cohen*, 372 F. Supp. 2d 340, 347 (E.D.N.Y. 2005) (finding a defendant was in custody where "he knew he had to remain seated"). A drug detection canine was en route. Although Defendant remained in a private vehicle on a public highway, his subsequent arrest appeared, at that time, inevitable. The totality of the circumstances thus supports a conclusion that Defendant was in custody when Trooper Baker approached the red truck and questioned its occupants.

For the foregoing reasons, Defendant's motion to suppress his statements is insofar as it pertains to questioning prior to Trooper Baker's arrival is DENIED and his motion to suppress this statements after Trooper Baker's arrival is DENIED AS MOOT as the government agrees not to offer those statements in its case-in-chief.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress evidence and statements (Doc. 47).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _12th_ day of December, 2014.

Christina Reiss, Chief Judge
United States District Court